We will offer you 15 minutes per side and 5 minutes additional for the epaulant. We ask that you speak up so that we can hear you and everyone else in the courtroom can as well. We are familiar with the arguments and the facts. So if you are ready to proceed, the epaulant may step up. May it please the court, counsel, my name is Debra Nall and I represent the epaulant, Frederick Goings. The only issue at trial was whether Mr. Goings was the person who committed these murders. Yet the state relied heavily on highly prejudicial, tangential evidence that was designed solely to inflame the passions of the jury. Evidence about how the murders affected Nova's surviving family and evidence from the 2007 order of protection hearing. First, in issue 3, we argued that evidence about how the murders affected Nova's family, particularly her surviving son Noah, had absolutely nothing to do with Goings' guilt or innocence in this case. Thus here, as in Burnett and Hope, the evidence had no purpose but to prejudice Goings in the eyes of the jury and arisen in anger, hate, and passion. The evidence was presented in such a way as to make the jury believe it was material, especially because the trial court continually overruled the defense objections. The admission of this evidence therefore deprived Goings of his right to a fair trial. The state entirely fails to address Burnett and Hope. What are those statements you are referring to? It's not just statements. It was the method of presentation of the photographs and particularly the crime scene video where the state stopped the video multiple times and pointed out children's shoes, children's bedrooms, focusing on... Most of that stuff was found in close proximity to the bodies of the victims, wasn't it? Some of it was, yes. And it also depicted bloodstains all over the walls? Which the bloodstains over the walls, the state argued at great length that these bloodstains must have been caused by Noah finger painting in his family's blood, which is just absolutely horrifying. And had nothing to do with whether Goings was the person who committed this offense. It was designed solely to make the jury hate Goings and think about the effect of this tragedy on Noah and under Burnett and Hope, that's absolutely not permissible. And the fact that the state entirely fails to address Burnett and Hope shows that the state agrees with this argument. I'm not sure they agree with it, but go ahead. Was some of that in response to the defense theory that there was no blood found on the clothes of the person of the defendant? I don't think so because the state's argument preceded the defense response. So the state from the very outset, starting in its opening statements, it focused on Nova's role as a mother on the children and then the defense had to respond to the state's argument. And so it kind of did the best it could. But the state's case was before the defense case. The defense theory from the beginning was that Goings was unfairly targeted by Nova's family. The state never even investigated anyone but him. So the state's theory wasn't that this was some deranged madman. They just came up with that theory as a response to the state's argument. They had testimony that he threatened her life, threatened her family. She got an order of protection against him. Mother testified that on one occasion she had red marks around her neck. Do you think that's all irrelevant? I think that the evidence about Noah is not relevant. What evidence are you talking about? The method of presentation, the way in which the photographs... I understand what you're saying. Tell me what evidence you object to. What is it that they introduced that you object to? I object to evidence about Noah, the statement that he was painting in the blood. I object to the way that the state focused on... It explains how the blood stains got up and down the walls leading to upstairs and all over the walls in the foyer upstairs, doesn't it? It could have been done in a way that was not designed to inflame the passions of the jury. A lot of evidence inflames the passions of a jury. The question is, is it inadmissible? Is it so prejudicial that it outweighs its probative value? Now, they've got pictures of a crime scene where a mother and her child are murdered. They're laying in pools of blood. There are toys laying all over the place. Spent cartridges all over the place. Holes in walls and blinds. And blood leading up the staircase that never rises above four feet. And it looks like it wasn't spilled there, it was painted there. And Noah's found, hours later, still alive, covered in blood in his hands and feet. And the officer testified that it was reasonable to assume that that blood got on those walls because that kid painted it on there. What's wrong with that? That has nothing to do with the issue at trial. It has nothing to do with Goings' guilt. Well, it has something to do with the crime scene and where they were murdered, how they were murdered. There's evidence in the record that if they weren't shot where they were found, they walked a distance because there were blood drippings going from the stairs all the way to where they were found. Why is it irrelevant for the state to point at exactly what the crime scene looks like? The state did point to what the crime scene looked like, and then it went above and beyond that to show that Goings was this horrible person and that Noah had, it's difficult to even express how awful it is, which is why it's so prejudicial. And in Burnett and Hope, the Supreme Court made clear that this type of evidence isn't permissible, that the judge should have protected Goings from this sort of evidence being admitted. And, Counselor, are you also objecting to the testimony that Noah allegedly responded, Frederick did it, and Sanch as well? No, I'm not objecting to that. I'm objecting to the improper focus on the effects of the offenses on Noah. There's a little bit more than that. There's a closing argument, and there are some rather unusual statements made in the closing argument by the prosecutor, and I'd like to address those. So are you referring to the fact that Noah was terribly traumatized by the offense? He was a victim. He said he was a victim. Correct. But there was a response to a defense argument that was made suggesting that Noah, although he may have allegedly told his grandmother that it was the defendant that committed the offense, the defense attorney argued that he never told the victim interrogator that questioned him after, the child advocacy expert, that it was the defendant who did it. And in response to that, in rebuttal argument, the state's attorney said this kid was a victim too. That's another way of saying the kid's traumatized. The state also said in the opening and closing statement that Noah was terribly traumatized, and then it followed up during the rebuttal with he was a victim too. So this wasn't just in response to the defense argument. This was a central theme of the state's argument from the outset of its case all the way through. Well, what happened was in the opening and closing, the state went through all the evidence. And then at the end mentioned what happened to the family, that it was an absolute abomination, and that don't forget the three-year-old child in there. So there was a ñ can you say that that type of statement at the end, even if improper, was really a lot of emphasis was placed on that statement based on the rest of the closing argument? I'm sorry, I don't really understand. Well, I mean, it wasn't ñ there wasn't a great emphasis placed on it. It was so that the jury could be misled that this was material. Respectfully, I disagree. I think it was the very last thing that the state said at the end of their closing argument, which was traditionally ñ The opening, right. Right, sorry, the end of their first part of their closing argument. So they left the jury with this plea. It was a blatant plea to the jury's sympathies, and that was the final thing. And then the defense spoke, and then the prosecutor had the last word. Under Burnett and Hope, that is a reversible error. I don't know that ñ I'm going to turn to my next issue. Issue four, we argued that the transcript from the 2007 order of protection hearing should not have been admitted because hearings did not have a meaningful opportunity for cross-examination. And, Your Honor, I'm not arguing that this particular evidence was not relevant. I certainly think it was relevant. However, I think that's part of the problem. That's why it's so prejudicial. It was so relevant. It's the only evidence ñ Most of the state's evidence against a criminal defendant is prejudicial to the defendant. They're trying to get him convicted. I mean, they're not going to offer evidence that's favorable to him. So the question that I have is, what's wrong with it? Did it violate the Confrontation Clause or did it violate the statute? It violated the Confrontation Clause. Why? Because the motive and focus of the cross-examination at the 2007 hearing was not the same as it was at the trial. Because at the 2007 hearing, the state had to prove by preponderance of the evidence in a non-criminal proceeding that Nova was in need of protection. Whereas at the murder trial, the state was required to prove beyond a reasonable doubt that Goings had actually committed the offenses of which she was charged. So the motive and focus is absolutely not the same at these two hearings. Why? She testified at the 2007 hearing to various episodes of abusive behavior, including specific details and time frames of physical and emotional attacks. She revealed that the defendant subjected her to numerous forms of psychological abuse, he accused her of incest and yelled at her, accused her of cheating, unlocked her phone, testified that he attempted to isolate her from her friends, and prevented her from leaving the house. On one occasion, he grabbed her and, when she attempted to leave, he put a hammer on her neck. On cross-examination, the defense attorney in that case went after her credibility very well. Brought out that she lived in a separate residence, had opportunities to leave him, she chose to stay in his house, admitted that she told him that she wanted to marry him, even allowed him to stay at her residence, acknowledged that he provided legal representation in her child support case, he loaned her money for parking tickets, and he challenged her claims regarding physical abuse. Why didn't he have a full right to cross-examine her on things that were relevant to this case? Because the issue was completely different. The stake was completely different. He wasn't defending whether he'd actually done or not done those things. The issue was whether Nova had a reasonable fear of her safety. So it wasn't deciding whether... The fear of her safety was based upon the things he had done. That's exactly what they were trying to prove. They weren't proving whether he'd done those things or not done those things. They were proving that she believed that she was in danger from him, which is very different. But even if this court were to find that the motive and focus were the same, it's different because there was no opportunity for discovery. So as in... Sorry, I'm losing my... Torres discusses a case, I think, of Rice, where there was no opportunity for discovery prior. So that means there was no meaningful opportunity for cross-examination, which is part of the consideration. So to determine if there was a violation of the right to confrontation, you consider both the motive and focus of cross-examination, but ultimately the question is whether there was a meaningful opportunity for cross-examination. And here there certainly was not. Moreover, these errors were fully preserved. The state cannot establish beyond a reasonable doubt that the erroneously admitted evidence did not contribute to the verdict in this case. All of the evidence that was admissible was colored by the inadmissible evidence. For example, the text messages, which on their own are certainly disturbing, but they are ambiguous. And it's only when they're considered in light of particularly the order of protection hearing, where we had basically Nova speaking from the grave about direct death threats, which we have no other direct evidence of that in this trial. That taints the text messages and makes them become sinister in a way that I don't know that they would have become were it not for the inadmissible evidence. There was no definitive evidence tying Goings to the murder weapon. The historical cell phone location information placed Goings not at Nova's home, but near her home.  And also on cross-examination he admitted that cell phones are usually within a one or two mile radius from the tower they utilize for a call. But that rule doesn't apply to downtown Chicago, where there's so many towers. What do we do with the gunshot residue that was found in his car? That evidence would also be inadmissible. Why is that? I'm sorry? Why is that? Under our argument, too, that the real-time cell phone location information without a warrant violated the Fourth Amendment in the Illinois Constitution. There's no evidence in the record as to exactly how they found the cell phone location, other than we contacted Sprint. There's absolutely nothing else in this record to say exactly how they got it, who supplied it to them, or how they got it. The only information we need to decide this issue is whether they contacted Sprint and got the information without a warrant, which we know they did that. There's no expectation of privacy in cell phone communication. Well, that's the issue presented. Well, that's what the Supreme Court of the United States has said. The Supreme Court has not yet decided this particular issue. But they have indicated there's no expectation of privacy in cell phone communication. I disagree. I think under most... Well, you can disagree with them all you want, but they are the Supreme Court of the United States. Under United States v. Jones, the United States Supreme Court held that placing a GPS device on a suspect's car without a warrant... Ah, that's a little bit different. That's placing a device on the car. They place no device on this car. That is different, but we are arguing that the contemporaneous tracking of the device used in Jones is the same as the real-time cell phone location information that the state used to track Goings' location in this case. So the Supreme Court hasn't yet decided the precise issue presented here. And that when you look at Jones, particularly concurring opinions, which focus on the ways in which modern methods of electronic monitoring, including cell phones, permit the government an unprecedented ability to cheaply generate a comprehensive record of a person's life, and thereby may alter the relationship between citizen and government in a way that is inimical to democratic society. Based on this reasoning, the Fourth Amendment certainly protects the cell phone location information, but even if this Court determined that the United States Supreme Court and the Fourth Amendment don't protect this, the Illinois Constitution does protect it. Why is it worded differently than the U.S. Constitution? It is worded differently. Why don't we interpret it in lockstep? We have language that's different from the Fourth Amendment. It includes an additional protection for, quote, invasions of privacy or interceptions of communications by eavesdropping devices or other means. But they didn't intercept any communications by any eavesdropping devices, and they planted no devices on his car. Somebody told them where the last ping was at. Well, pinging is a form of intercepting. No, no, no. They didn't cause the ping. His cell phone caused the ping. He caused the ping, not them. All that was printed was telling them where the last ping came from. Also, the debate sitting to the provisions enactment prevents the framers' intent to protect the people of Illinois from police being able to use real-time cell phone location information to conduct electronic surveillance without first obtaining a warrant. And I think that my time is up. May I reserve the remaining couple of minutes? Yes. Good morning. May it please the Court. My name is Peter Fisher. I'm an Assistant State's Attorney on behalf of the people. Just briefly on the last issue that was raised, there's kind of an anachronistic discussion going on in the defendant's brief and then here today, this term of real-time cell phone tracking and GPS chips and things like that. We have to remember this case was the defendant committed this murder in 2009, January. The cell phones were probably made in 2008 or earlier. There was no ability to do GPS tracking. There was no chips in those things. We don't have any evidence of that. Well, there is no evidence in the record that something like that existed. Why don't you just address the question of whether getting the information from Sprint as to where the last ping came from is somehow violating Wisconsin's Fourth Amendment rights. Well, there certainly is no case, as the defense has conceded in their brief, there's no case in Illinois or in the country that says that at best, from this record, you could argue that what happened is the police got cell phone information from Sprint, third-party records held by a private corporation, not collected pursuant to the government, not collected pursuant to any government action. This notion that there was a pinging, this isn't a case where there's any evidence that the police asked the phone company to locate the phone in terms of send a message out, see if something comes back. The evidence in the record shows that there was a communication from the defendant's cell phone in Michigan City, Indiana, which is a large quadrant in and of itself. In order for a defendant to win this issue, had there been a motion to quash, which there was not, so our argument, of course, is that the issue cannot be decided, that particular issue cannot be decided because, defendant, there was no hearing on this issue. But first of all, they have to show a reasonable expectation of privacy in the third-party records in this private corporation, and there's no case that says that. They would also have to show that there were no exits in circumstances, which I believe we would be able to show there were. Furthermore, what eventually was gleaned by way of this information was simply that the Michigan City, Indiana, police officer drove up and down public streets in Michigan City, Indiana, coming to a fully visible parking lot at the Comfort Inn where this car was parked. So does the defendant have a reasonable expectation of privacy in the fact that people can walk by and see that his car is parked in a public and open and accessible place? He drove it from Chicago on public streets, so his location in Indiana was not a secret to anyone who happened to go by this car. So there, frankly, would have been no chance in the world for a defendant to have won this at trial at the level, at the trial court level. And of course, there isn't enough information in the record to reverse on this issue as we put it out in the briefs. Was the gunshot residue in the car what was the subject of that potential motion to quash or was that evidence collected pursuant to a warrant? That's kind of unclear. Their motions to quash were filed in piecemeal because even after one of them was set to go, they filed an additional one relating to computers. Basically, it was kind of a catch-all, let's throw everything out. The car was seized pursuant to a warrant, a search warrant, which was issued in Indiana. Lieutenant Walsh, one of the officers who was available for that motion, but the defense refused to call, and three Michigan City Indiana police were there as well. So the car was seized pursuant to a search warrant. It was searched pursuant to an Indiana search warrant. The hotel room at the Comfort Inn was searched pursuant to a search warrant. The defendant's house was searched pursuant to a search warrant. There was a series of search warrants here. No Franks hearing was really asked for. There was a whole bunch of things that would have had to have happened, a whole series of things. But the gunshot residue found in the car, there was gunshot residue found on the sleeve of the coat that was found in the Comfort Inn as well. That was seized pursuant to a valid search warrant in Indiana. Counsel, why shouldn't we hold that the evidence that three-year-old Noah was playing for hours, finger-painting in his sister's and his mother's blood, that that is highly prejudicial? Why shouldn't we hold that? Well, it is prejudicial, but it's not unduly prejudicial. The question is, is it more prejudicial than it is prohibitive, and we would argue, of course, that it's not. That is the issue. And this is an abuse of discretion standard. When you look at these cases, when you've done a lot of these cases over a long period of time, as a prosecutor, as a defense attorney, you know what issues are going to come up. Now, the fact of the matter is that the defendant was not covered in blood, or at least his clothes were not covered in blood, the clothes that were recovered. There's no blood in his car. And it is, in fact, a very bloody scene. And one could anticipate that the defense would be arguing, which they did, that the real killer has to be covered in blood. The defendant can't be the real killer because he's not covered in blood. Now, the facts showed, and they're uncontested, that Noah was found in that living room on a chair. His feet and hands were caked in dried blood. There is blood all over the house, but in specific areas, all areas below four feet off the ground. There's blood in Noah's bedroom, but not in the little girl's bedroom, the baby's bedroom, Ava's. There's blood in places where Noah would have gone. There's toys dropped next to the dead bodies. The reasonable inference of all this is that the blood, that the real killer shot the two victims and walked out the front door without tromping into blood. There's no bloody footprints. There's no bloody footprints down the front stairs, which you would expect had somebody tromped in the blood other than the baby. And so all these are reasonable inferences to rebut that statement that the defense was going to make. In fact, before the pictures were shown, the defense was already asking questions of the detective or the police officer who testified before the evidence technician who testified about taking the video and the pictures and stuff. They were asking, well, you know, would there be blood in the killer? They asked several questions about this sort of thing. So it's entirely reasonable and proper for them to argue that and to put this evidence in. The evidence was relevant, and it was a bloody scene, but it was the murder scene. And as has been pointed out, there were lots of pieces of evidence in that apartment. I mean, there's bullet holes in the wall. There's cartridges. Of course, there's pieces of paper on the counter in the kitchen. There's the computer. There's a lot of pieces of evidence in that house that go directly to this case. The other piece of so-called prejudicial evidence is the statements about the fact that Noah was traumatized. And, again, this is not just responding to the defense argument, but responding to the... No, that was in the opening. It was in the government's opening. It wasn't in the rebuttal. The rebuttal is where you call him a victim. You say he was traumatized in the opening argument. You mean the opening statement before trial or the opening statement... No, the opening argument after trial. What happened to this little family was an absolute abomination. It's enough to make you lose your faith in the human race. I'm not just talking about the murders itself. Don't forget about the three-year-old little child in there. That was in the beginning argument of the state. It was after a lengthy recitation of the facts in the case and a summary of the case. And also the defense several times asked three witnesses during this trial questions about the fact that Noah didn't say anything at the CAC or to the police or anything like that and didn't say anything about the defendant being the killer. The defense put that in to try and rebut the Frederick, Frederick, shh type statement that was introduced earlier. So it was certainly in response to those types of questions that the state was entitled to bring up the trauma that Noah had gone through and explain the fact that he didn't make a statement that he was a traumatized three-year-old child. The order of protection hearing under Sutherland has to be... Everybody concedes that, of course, the declarant is unavailable here. That's not an issue. The question is whether or not the cross-examination... There was an opportunity for cross-examination in a proceeding that had the same or similar focus. The notion that there was no discovery... Well, no preliminary hearing transcript could ever come in under that theory because there's no discovery before preliminary hearings. But we know that those types of transcripts come in. As Your Honor pointed out, as we pointed out in the brief, not only did the defense have an opportunity to fully cross-examine the victim in this case at the preliminary hearing, they took advantage of that. They showed their purpose... Had Noah testified at the trial of this case, obviously she couldn't, but let's say it was an attempt murder and she was testifying or something like that, they could have introduced this and the same questions would have been asked. Questions going to, did this really happen? What are your motives? They brought up motives, financial motives that she might have for discrediting the defendant. They brought up the fact that they'd gotten together and they'd broken up. So there was a lengthy cross-examination. And so not just the opportunity, but they actually took advantage of the opportunity to cross-examine. I want to go back to this closing argument because I'm having a little bit of trouble with the ending remark in the rebuttal argument showing the picture of the two victims and Noah, mother and two children, and urging the jury to, quote, do justice to what's left now of this beautiful family of three. Is that somehow relevant to this case? I think it is. I think it is. Do you think it's stepping over the bounds a bit? Well, I mean, as the Supreme Court has pointed out, everybody realizes that murder victims leave families. These things don't happen. I mean, murder cases leave families. Well, it's one thing to say they have a family. It's another thing to play on the hard strings of the jury and say do justice to this family. You're doing justice to the people of the state of Illinois. And then the family is part of that as well. I would argue that that was a proper comment. Do you think that's a proper comment? I think you'd be better off arguing it was harmless error. Well, it was that as well. But I think it was a proper comment given the context. And certainly there's 8,000 pages of transcript in this case, Your Honor. Fifty witnesses testified for weeks. The jury was fully aware of what the case was about and what the evidence was about. They'd heard overwhelming evidence of the defendant's guilt. Any comments made at closing in this case did not break the camel's back. This case was really as open and shut as you can get in a circumstantial case. Everything points squarely at the defendant. The evidence is overwhelming. And anything said in closing arguments could not possibly have changed the result. For the reasons that we've stated today and the reasons that we've stated in the brief, we'd ask that Your Honors affirm the defendant's conviction and sentence. Thank you, counsel. Thank you. I'll try to be brief. First, the Fourth Amendment issue. There weren't any accident circumstances here, as demonstrated by the way that You don't even know how they got the information. There is no evidence in this record as to how they got the information. All it says is investigating police officers called Sprint, and somehow they were given the information as where the last pain came from, Michigan City, Indiana. So if this court determines that there isn't sufficient... So, in other words, based on that, they couldn't contact the Michigan City police and ask them to look for a car? The car was found on the street. I mean, the fact that they knew it was Michigan City, Indiana, you can argue is the fruit of the poison tree? I'm arguing that, yes. But in the alternative, I'm arguing that there should at least be a remand for a proper hearing on counsel's motion to quash the arrest. Did counsel ever try and get a hearing on that motion? Or did she keep refusing to call her witnesses? No, counsel definitely tried to get a hearing on that issue. And what happened? So initially she showed up for the hearing, and only one of the eight witnesses she had subpoenaed was present. And this is all laid out in my report. And she asked for a continuance and got it? Well, she didn't ask for a continuance. She sought to make a record as to why she needed... She wanted a continuance and got a date? The court refused to allow her to make a record. The court insisted on making the proceedings happen the next day when counsel already knew and tried to explain that her witnesses weren't going to be able to be there. Of course, none of the witnesses showed up. And then when counsel finally was able to make her record, she explained that the subpoenas had gone out to the officers and they didn't receive them because some of those officers had retired or whatever. So counsel knew that the officers wouldn't be able to be there and she needed to make... Who testified as to how they got the information from the Sprint? Which one of the Chicago police? I think it was Officer Wooden Nicky. I'm pretty sure. Wooden Nicky testified that he and investigating officers got the cell phone number from a neighbor and then they contacted Sprint and... Without a warrant. With Sprint's assistance, they were able to pinpoint the location of the last ping. The ping, right. And that's all that's in the record. Did she have an opportunity... Did the defense attorney have an opportunity to cross-examine him then? Of course she did. It wouldn't be possible. Come on. You know, you've got to be a little bit candid here. She had a thorough opportunity to cross-examine him. How they got it? What happened? They didn't. They notified the Michigan City Police Department, gave him the license number of his Range Rover, and the Michigan City Police Department went looking for him. And they found him. So on that note, I would ask that this court consider remanding for additional proceedings on the motion to quash. Turning to the evidentiary issues, it's actually a de novo standard of review because they are constitutional issues, and the evidence was certainly unduly prejudicial. Regarding the order of protection hearing, this court in Peeble v. Woke held that the focus of an order of protection hearing is the immediate protection of abused family or household members, not the guilt of the accused and the more general protection of society. Also, in Davis v. Washington, the United States Supreme Court rejected a request for greater flexibility in domestic violence cases, holding that even if the criminal was granted a windfall, that that did not allow the court to, quote, That same principle applies in this case. This court should not ignore these gross violations of constitutional rights just because there was evidence showing that this person may have committed the crime. Everyone deserves a fair trial. I'd ask this court to reverse and remand for a new trial or, on the alternative, for a hearing on the defense motion to quash. Thank you very much, counsel. The case will be taken under advisement.